02-12-137-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-12-00137-CV

 

 


 
 
 In
 the Interest of B.R., B.R., and B.E.R., Children
  
  
  
  
  
  
 
 
 §
  
 §
  
 §
  
 §
  
  
 
 
 From the 30th District Court
  
 of
 Wichita County (11750-JR-A)
  
 January
 4, 2013
  
 Opinion
 by Justice Gardner
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed.

 

SECOND DISTRICT COURT OF APPEALS

 

 

 

By_________________________________

   
Justice Anne Gardner

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-12-00137-CV

 

 


 
 
 In the Interest of B.R., B.R., and B.E.R., Children
 
 
  
 
 
  
 
 
 
 
  
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

 

----------

FROM THE 30th
District Court OF Wichita COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

Appellants
B.E.R. (Father) and C.R. (Mother) appeal the trial court’s judgment terminating
their parental rights to their three children: Bethany, Brittany, and Brandon.[2] 
In three issues, Father argues that the evidence is factually insufficient to support
the jury’s findings on statutory endangerment and the children’s best interest. 
Mother argues in one issue that the evidence is legally and factually
insufficient to support the jury’s best interest finding.  We affirm.

II.  Background

Mother
and Father have five children: Blake, Bradley, Bethany, Brittany, and Brandon.[3] 
Bethany, Brittany, and Brandon were deposed in July 2011 and again in 2012.  At
the time of the 2012 depositions, Bethany was thirteen, Brittany was twelve,
and Brandon was ten.

Trial
was in March 2012, and the children’s 2012 depositions were played for the
jury.  Bethany testified that there had always been some sort of violence
between her parents.  Bethany testified that she saw Father hit Mother, that
there were times when she could not see Father hit Mother but heard punching
sounds, and that Mother also hit Father.  She testified that she was scared
when her parents fought and that she was afraid that Father would take their
arguments out on her.  She also testified that she felt like her parents did
not love each other when they fought.

Brittany
testified that Father hit Mother and that she went to her room when her parents
fought.[4]  She testified that she
had heard Mother cry when Father hit her and that Mother had told her that she
hit Father.  She also testified that it was scary when her parents fought and
that she was afraid that she or her siblings would get hurt.  Brandon testified
that he saw Father hit Mother several times.  He testified that he went to his
room but that he still heard slapping sounds and Mother crying.  Brandon
testified that he was scared that Mother would get really hurt.  He also
testified that he saw Mother hit Father.

In
October 2009, the Department of Family and Protective Services (the Department)
removed Bethany, Brittany, Brandon, and Bradley after the police and SWAT team
arrested Father for assault family violence.  Police records admitted at trial
indicated that Bradley asked his girlfriend to call the police because he heard
what sounded like Mother being hit and choked.  The records further indicated
that when police arrived at Mother and Father’s home, all of the lights were
off, and no one answered the door.  Father testified that after the second
doorbell ring, he looked out his window and saw a police officer in his yard. 
Father also testified that he and Mother decided that the police were there to
arrest Mother.[5]  Father testified that he
“did not have a need to open up the door” and that he went back to bed.[6] 
Father testified that Mother then heard police call his name and that he got
out of bed and went outside.  Father was arrested when he exited the home.

Several
officers reported that they observed red marks on the right side of Mother’s
neck and a bruise on her mouth that appeared to be covered with make-up. 
Mother testified that she did not have any bruises.  The police reports stated
that Mother was uncooperative, insisted that no one had been assaulted, refused
to allow police to photograph her, and expressed her hatred of police.  Father
testified that he did not assault Mother.

After
the removal, the trial court ordered the Department to return Bethany,
Brittany, and Brandon to Mother through a six-month monitored return.[7] 
Father testified that he was ordered to leave the home during the monitored
return and that he lived with his mother, M.R., for three months and then lived
alone in an apartment for three months.[8]  Mother testified that
she knew Father was not allowed contact with the children, but she allowed the
children to make videos on her phone that she sent to Father.  Bethany and
Brittany testified that Mother took them to see Father during the monitored
return and told them not to tell anyone, but Mother disputed that testimony. 
Bethany, Brittany, and Brandon testified that no one was hit or choked, that there
was not much screaming and yelling, and that things were better in their home
when Father did not live with them.  Father testified that he returned to the
home in May 2010.

Mother
testified that she left Father in September 2010 to have an affair with a woman
who she worked with.[9]  She testified that she
told her girlfriend that she left Father because she did not want to argue with
him anymore.  Bethany testified that Mother left because she was tired of Father
hitting her.  The children remained in the home with Father while Mother was
gone from September until October 2010.  Mother testified that Father did not
work while she was gone and that she left less than $1,000 in a bank account
for Father to use to support the children.[10]

Mother
testified that she stayed in a hotel and then went to First Step, a battered
woman’s shelter.  She testified that she went to First Step for shelter, not
for the services they provide.  The police were dispatched to First Step in
September 2010.  Mother told police she was staying at First Step due to
domestic violence issues involving Father and that Father had followed her from
Wal-Mart to First Step.  According to the police report, Mother yelled at
Father to leave her alone, and he continued to approach Mother even after
police ordered him to stop.  The police then pointed a gun at Father and
ordered him back to his vehicle.  The report also stated that Father had a
knife in his front pocket and a metal baseball bat in his vehicle.  Mother
denied that she yelled at Father and testified that she did not see a knife or
baseball bat or the police point a gun at Father.  Mother also testified that
she was not concerned when Father followed her to First Step.

In
October 2010, Bethany told her school counselor that Father had “ʻkind of’
choked her,” and the Department again removed the children from the home. 
Bethany testified that she also told her school counselor that she was afraid
of Father and that Father was physical with her.  Father testified that when
Department investigators came to his house, he would not allow them to speak to
his children unless he was in the room.  He also testified that he told the
children not to talk to the Department unless he was present and that he
instructed them to call him if the Department came to their school.  Father
testified that he took the Fifth Amendment multiple times at the adversary
hearing when asked about hitting and choking his children.  He testified that
he was then ordered to have no further contact with the children.

Mother
testified that she and Father agreed that the children were not to associate
with friends outside of school if Mother and Father were not present.  Mother
testified that they did not allow the children to stay overnight at a friend’s
house, have friends visit the home, attend birthday parties, talk on the
telephone unless it was to a family member, or go anywhere without Mother and
Father watching them.  Father testified that he did not allow the children to
answer the door at his house, play in the front yard, or play with friends
unless he could see them.  Bethany testified that her parents only allowed her
to answer the door for her brothers and that she was not allowed to answer the
door for the police.  She testified that she had never been to a birthday party
and that she had never had a friend visit her house.  Bethany testified that
she did not have a life outside her parents’ home and that she and her siblings
were kept in isolation when they were not in school.  Brittany testified that
Father would not allow her to spend the night at a friend’s house, talk on the
phone to friends, or answer the door at their house.

Bethany
acknowledged that her 2011 and 2012 testimonies differed and that she did not
tell the truth in her 2011 deposition.[11]  In her 2011 deposition,
Bethany stated that Father hit her only in August 2010, but she stated in her
2012 deposition that Father also hit her in September and October 2010 and that
he hit her before Mother left in September 2010.  She also testified during the
2012 deposition that she did not know how many times Father had hit her because
he hit her “all the time.”  During the 2011 deposition Bethany testified that
Father had choked her twice, but she testified in 2012 that Father had actually
choked her over five times.  Bethany also testified in 2012 that Father had
choked, punched, and slapped her in the face, stomach, arm, and back.  She
testified that Father told her it was her fault that he had to choke her, that
Father had choked her because she smiled at a boy in the grocery store, and
that he had never apologized to her for hurting her.[12] 
Father testified that he was upset with Bethany when she winked and smiled at a
boy in the grocery store, but he denied assaulting her.  Bethany also testified
that she saw Father hit every one of her family members and that Father hit her
more than the other children, that she and Father had argued almost nightly,
and that Father had told her not to tell anyone about the arguments and
fighting.

Brittany
testified during her 2012 deposition that she saw Father hit Bethany and that
he hit Bethany the most out of the three children.[13] 
Brittany testified that she was reading a book while Father was talking and
that he took the book out of her hand and hit her on the shoulder with it.  She
also testified that Father did not want her to tell people what happened in
their home and that he told her, “[W]hatever is in this house stays in the
house.”

Brandon
testified that Father tried to spank him because he did not clean his room.  He
testified that when he tried to avoid the spanking, Father threw him on the
couch and choked him with both hands.  Brandon testified that he could not
breathe when Father choked him and that it hurt and scared him.  He testified
that Father had not apologized for choking him.  Brandon also testified that he
saw Father hit Bethany and choke his oldest brother Blake.

Bethany
testified that she first disclosed that Father checked her to see if she was
having sex in September 2011.  Bethany and Brittany each testified that Father
told them to come into his bedroom, remove their pants and underwear, and lie
down on his bed.[14]  They testified that
Father told them to spread their legs and that Father then looked at their
private areas below their waists.[15]  Bethany testified that
Father told her he checked her because he thought she did something with a
boyfriend, and Brittany testified that Father told her he checked her to see if
she had sex with a boy.

Bethany
testified that Father first checked her when she was ten and that he checked
her twice a month.  Brittany testified that she was in elementary school when
Father first checked her and that she did not remember how often he checked
her.  She testified that she initially told CPS that Father did not check her
because she was embarrassed and afraid that Father would find out if she told
the truth.  Brittany testified that Father told her not to tell anyone that he
checked her.  She testified that she did not ask Father to stop checking her
because she was afraid to make him angry.

Father
denied checking Bethany and Brittany.  He testified that he talked to Bethany
about sex when she was nine and that he asked her if she was having sex when
she was eleven and when she was twelve, but he testified that she denied having
sex both times.  Bethany testified that she was not having sex.  She also
testified that Father wanted to put her on birth control when she was ten
because he was afraid she would get pregnant.  Father testified that he asked
Brittany about sex when she was ten and that he asked her when she was eleven
if she was having sex.  Brittany testified that she told Father she was not
having sex but that he did not believe her.

Father
testified that he had not worked since February 2011 and had not applied for a
job since May 2011.  He testified that he worked for the Electra Police
Department from 1994 until 1995 and then worked for the Forest Hill Police
Department from 1995 until 1999.[16]  He testified that the
Forest Hill Police Department fired him in 1999.  On June 4, 1999, the Forest
Hill Police Department placed Father on indefinite suspension for employee
misconduct.  The indefinite suspension letter stated that Father had confronted
Arlington police officers on November 14, 1998, attempted to influence them in
Mother’s arrest, and was untruthful to the internal investigating officer
concerning the incident.[17]  Father denied having
done so.

The
jury heard other evidence of Father’s disciplinary history at the Forest Hill
Police Department.  When a tow truck driver attempted to repossess Father’s
vehicle, Father approached the driver and threatened to shoot him.  The
Arlington police arrived, and Father displayed his weapon and identified
himself as a Forest Hill police officer.  On a separate occasion, an Aaron’s
Rental employee attempted to repossess Father’s personal property, and Father
became physical with the employee.[18]  Father also had five other
disciplinary incidents while working for Forest Hill Police Department.

Father
testified that he had not tried to obtain another law enforcement job and that
he was unemployed from 1999 until 2005 because he had problems with depression,
anxiety, and headaches.  He testified that he held various other jobs for a few
months at a time but that he quit because they were either too stressful or not
in a management position.  Mother testified that Father had quit two jobs
because she and Father believed the jobs were beneath his capabilities.  Father
testified that he did not feel well enough to get a job, but that he would have
motivation to find a job if he got his children back.  Father testified that in
December 2010 he was court-ordered to obtain gainful employment and agreed that
he had not come close to following that order.  He testified that he had known
about the trial since January 2012 and that he had not tried to get a job.  He
also testified that he had not tried to find a job because he suffered from
major depression.

Father
testified that he first went to Helen Farabee (MHMR), the local mental health
center, in April 2001 and was diagnosed with Posttraumatic Stress Disorder and
depression.  Father testified that he met with Dr. Decena once every three
months from 2001 until 2004.  He testified that he stopped seeing Dr. Decena in
2004 and did not see another mental health professional until March 2011.  He
testified that he went back to MHMR in March 2011 and saw Kevin Thompson once a
week until November 2011.[19]  Father testified that
he stopped seeing Thompson because he had completed the behavior plan Thompson
had created to help him cope with depression.  However, Thompson testified that
he stopped seeing Father because the staff felt like Father humored them by
going through the motions.

Father
testified that he applied for social security benefits in August 2011 and that
he listed major depression as his disability with a disability start date of
March 2011.  He testified that his application for social security was denied. 
Father also testified that he answered discovery in May 2011 and did not
disclose that he suffered from depression and that he never asked CPS to get
him help for his depression.

Father
testified that he was arrested by the Arlington Police Department for harboring
Mother, but he denied that he had harbored her.  The Arlington Police
Department’s Arrest Warrant Affidavit states that on May 29, 1999, Father
shouted at officers to get out of his home and that he aggressively approached
an officer, grabbed his arms, and pushed him backwards.  Father denied grabbing
or struggling with the officer.

At
the time of trial in March 2012, Mother was in Dawson State Jail serving a
fourteen-month sentence for a probation violation.[20] 
Mother had an extensive criminal history and testified that she had several
charges and convictions for theft because she “had a problem . . . [w]anting
more than [she] really needed at the time.”  She testified that she had served
a previous fourteen-month sentence at Dawson State Jail.  Mother could not
recall all of her criminal charges and testified that she did not know how many
times she had been charged with theft.  She added that her criminal history did
not contain convictions for acts of violence and that her convictions were
mostly for theft.  Mother testified that she wrote 298 bad checks totaling
$27,000.

Department
caseworker Linda Johnson testified that she thought Mother was going to jail in
December 2010 and that she developed Mother’s service plan accordingly.[21]
 Johnson testified that Mother complied with most of her service plan; Mother
signed the HIPAA release, participated in available services in jail,
summarized the parenting information sent to her in jail, and underwent a
psychological evaluation.  Mother testified that she took a parenting class but
refused to discuss domestic violence because she felt that her parenting
trainer was investigating her and trying to place criminal charges on her and
Father.  Mother also testified that there was no domestic violence in her home
and that she would not discuss domestic violence.  Johnson testified that the
most important part of Mother’s service plan was the requirement that she
obtain and maintain safe housing that was free from domestic violence once she
was released from jail.

Mother
testified that she told Johnson that she had no intention of leaving Father. 
Johnson testified that she previously told Mother that the Department’s position
was that it would not return the children to her as long as she was living with
Father.  Mother testified that the Department indicated to her that it wanted
her to end her marriage to Father and that she made it clear to the Department
that she had no intention of ending her marriage.  She then testified that
Johnson never told her that she had to divorce Father but that Johnson had told
her that there could come a point when she would have to choose between her
husband and her children, since the Department would have to remove the
children from the family violence.  Johnson testified that the only portion of
Mother’s service plan that she had not complied with was maintaining a home
free from domestic violence.  She testified that this noncompliance was enough
to determine that Mother failed to comply with her service plan.

Johnson
testified that she developed Father’s service plan and discussed the plan with
him in December 2010.  Johnson testified that Father complied with parts of his
service plan.  Father complied with the law, refrained from committing illegal
acts, had not allowed people with a criminal or drug lifestyle in his home,
provided information on people living in his home to CPS for them to run
background checks, completed parenting classes, and completed a psychological
evaluation.[22]  However, Johnson
testified that Father did not notify her of his change in phone number, did not
keep in frequent telephone contact with her, and did not regularly meet with
her.  Johnson testified that Father did not complete a budget form or sign his
MHMR release.[23]  She also testified that
Father failed to obtain and maintain a legal source of income.

Johnson
testified that she first heard of Father’s extensive MHMR issues during trial. 
Johnson testified that she met with Father in April 2011 and that he did not
mention that he went to MHMR the previous month and did not disclose his major
depressive or posttraumatic stress disorders.  She testified that Father was to
attend counseling with Dr. Vandehey and receive intense education in the
effects of domestic violence on the family, but Father did not attend the sessions.[24] 
She also testified that she first heard that Father saw Kevin Thompson during
trial and that Thompson is not the court-ordered counselor mentioned in
Father’s service plan.

Father
called Robert Campbell and Brian Brunker as character witnesses at trial. 
Robert Campbell, a family friend, testified that the children’s relationship
with their parents appeared normal.  Campbell testified that when he spent time
with the family he did not notice anything out of the ordinary and that the
children had never alleged that anything had happened to them while in their
parents’ care.  Campbell then admitted that he did not know the children’s
names or ages or which children were involved in the termination case.  Campbell
also testified that he was never around the children without Mother and Father
present and that he had only been to their home around six times in the past
twenty years.

Brian
Brunker, a Wichita Falls police officer, testified that he lived next door to
the family.  Brunker testified that he had seen the children play in the
backyard and that he had never observed anything unusual about their demeanor. 
He testified that the children had never approached him and claimed that their
parents abused them and that he had never noticed any marks or cuts on the
children that appeared to be the result of physical abuse.  However, Brunker
testified that the only conversations he had with the children were when they
had asked permission to retrieve tennis balls from his backyard.  Brunker
testified that he did not know that Mother had written bad checks, that Father
was indefinitely suspended by Forest Hill Police Department, what went on
inside Father’s household, or the specifics of the SWAT team incident.  Brunker
also testified that he did not have a close relationship with Bethany,
Brittany, or Brandon and that he did not know much about Father.

Father
testified that his biggest problem in the past was his overwhelming sense of
loss but that he was now positive about the future and believed that his family
was salvageable.  Father testified that he felt that he and Mother could
provide for the children emotionally and physically.  He also testified that
the children would have to become reaccustomed to the home environment and his
rules.

Father
testified that “there [were] a lot of lies within [Bethany’s] deposition.”  He
testified that all of the allegations against him were false and that he did
not think this should be a termination case.  He also testified that
termination was not proper in a case where the parent routinely looked at
female children’s genitalia, beat and choked a child, or beat and choked the
other parent.  He further testified that termination was not proper in a case
where a parent routinely committed criminal behavior and had been sent to
prison.

Mother
testified that M.R. lived with Father and paid his bills and rent.  Father
testified that M.R. was sixty-three, worked full-time, had stomach and lung
cancer, and received chemotherapy treatments every two weeks.  Father testified
that M.R. will assist them when Mother is released from jail but that he had
not made arrangements for where M.R. would live.  He testified that he did not
have a plan for living arrangements if his children came home with him.

Mother
testified that she believed her family was salvageable.  She testified that the
way she parented was the correct way for her children and that the children
wanted more freedom and had “ma[de] everything up.”  She testified that Bradley
fabricated the allegations of family violence that led to the first removal. 
She testified that Bethany and Brittany lied about Father checking them because
they did not like the rules at home.  She testified that she did not believe
her daughters and did not believe that Father had ever checked them.  Mother
testified that she would deal with Bethany’s and Brittany’s allegations that
Father checked them by going to counseling because she believed that Father
never checked the children.  Mother also testified that she was surprised that
Brandon discussed violence between her and Father and between Father and
Bethany.

Bethany,
Brittany, and Brandon testified that they love and miss Mother.  They also
testified that they love Father even after everything he had done.  Brittany
and Bethany testified that they did not want to live with Father and that they
did not feel safe living with him.  They testified that they would live with
Mother but that she would just go back to Father or would let them see Father. 
Bethany and Brittany testified that they wanted Mother’s and Father’s parental
rights terminated.  Brandon also testified that he did not want to live with
Mother or Father.

Bethany
testified that she felt that Mother began choosing Father over the children
when he moved back in after the 2009 removal.  She testified that she wished
Mother would choose her over Father but that she did not think Mother ever
would.  Bethany testified that she did not think that Father would ever
change.  Bethany testified that she did not want to go home; that she wanted to
be adopted; that she now participates in basketball, track, and volleyball;
that she is happy in her current placement; and that she wants to live there
permanently.  She also testified that she understood that there was no
guarantee that her current foster parents would adopt her but that she still
wanted Mother’s and Father’s parental rights terminated.  Brittany testified
that she wants Mother’s rights terminated partly because she kept going back to
Father.  She testified that she wanted Father’s rights terminated because he
was strict, because he hit people, and because she is afraid of him at times.

Johnson
testified that the children’s current foster parents want to adopt them as a
sibling unit and that the Department intends for the children’s current foster
parents to adopt them if the parents’ rights are terminated.  Court-Appointed
Special Advocate (CASA) Gary Cardwell testified that he had observed Bethany,
Brittany, and Brandon in their current placement and that they appeared happy
and well-adjusted.  Cardwell testified that, in his opinion, it is in the
children’s best interest for Mother’s and Father’s parental rights to be
terminated.  Johnson also testified that it is in the children’s best interest
to have Mother’s and Father’s parental rights terminated and that it would
impair the children’s physical and emotional development if Mother or Father
were appointed as managing conservator.

III.
 Standards of Review

In a
termination case, the State seeks not just to limit parental rights but to
erase them permanently—to divest the parent and child of all legal rights,
privileges, duties, and powers normally existing between them, except the
child’s right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West 2008); Holick
v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  Consequently, “[w]hen the State
seeks to sever permanently the relationship between a parent and a child, it
must first observe fundamentally fair procedures.”  In re E.R., No.
11-0282, 2012 WL 2617604, at *1 (Tex. July 6, 2012) (citing Santosky v.
Kramer, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).  We
strictly scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent.  Id.; Holick, 685
S.W.2d at 20–21.

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001 (West Supp. 2012), § 161.206(a).  Due process demands
this heightened standard because “[a] parental rights termination proceeding
encumbers a value ‘far more precious than any property right.’”  E.R.,
2012 WL 2617604, at *1 (quoting Santosky, 455 U.S. at 758–59, 102
S. Ct. at 1397); In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002);
see In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007)
(contrasting standards for termination and conservatorship).  Evidence is clear
and convincing if it “will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.”  Tex. Fam. Code Ann. § 101.007 (West 2008).

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination
is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001; In re
J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex. Dep’t of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625, 629
(Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).

In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the challenged ground for termination was
proven.  In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review
all the evidence in the light most favorable to the finding and judgment.  Id. 
We resolve any disputed facts in favor of the finding if a reasonable
factfinder could have done so.  Id.  We disregard all evidence that a
reasonable factfinder could have disbelieved.  Id.  We consider
undisputed evidence even if it is contrary to the finding.  Id.  That is,
we consider evidence favorable to termination if a reasonable factfinder could,
and we disregard contrary evidence unless a reasonable factfinder could not.  Id.

We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not
unreasonable.  Id. at 573.

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the verdict with our own.  In re
H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that the parent violated subsection (D), (E), or (O) of section 161.001(1) and
that the termination of the parent-child relationship would be in the best
interest of the child.  Tex. Fam. Code Ann. § 161.001; In re C.H.,
89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record, the disputed
evidence that a reasonable factfinder could not have credited in favor of the
finding is so significant that a factfinder could not reasonably have formed a
firm belief or conviction in the truth of its finding, then the evidence is
factually insufficient.  H.R.M., 209 S.W.3d at 108.

IV.  Statutory Endangerment

Father
argues in his first and second issues that the evidence is factually
insufficient to support the jury’s statutory endangerment findings.

A.  Applicable
Law

“Endanger”
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at
533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no
pet.).  Under section 161.001(1)(D), it is necessary to examine the evidence
related to the environment of the child to determine if the environment was the
source of the endangerment to the child’s physical or emotional well-being.  J.T.G.,
121 S.W.3d at 125.  Conduct of a parent in the home can create an environment
that endangers the physical and emotional well-being of a child.  In re W.S.,
899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ).  For example, abusive
or violent conduct by a parent or other resident of a child’s home may produce
an environment that endangers the physical or emotional well-being of a child. 
See id. at 776–77; Ziegler v. Tarrant Cnty. Child Welfare Unit,
680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref’d n.r.e.).

Under
section 161.001(1)(E), the relevant inquiry is whether evidence exists that the
endangerment of the children’s physical well-being was the direct result of the
parent’s conduct, including acts, omissions, or failures to act.  See J.T.G.,
121 S.W.3d at 125; see also Tex. Fam. Code Ann. § 161.001(1)(E). 
Additionally, termination under subsection (E) must be based on more than a
single act or omission; the statute requires a voluntary, deliberate, and
conscious course of conduct by the parent.  J.T.G., 121 S.W.3d at 125; see
Tex. Fam. Code Ann. § 161.001(1)(E).  It is not necessary, however, that
the parent’s conduct be directed at the children or that the children actually
suffer injury.  Boyd, 727 S.W.2d at 533; J.T.G., 121 S.W.3d at
125.  The specific danger to the children’s well-being may be inferred from
parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re
R.W., 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  As a
general rule, conduct that subjects children to a life of uncertainty and
instability endangers the children’s physical and emotional well-being.  See
In re S.D., 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

B.  Discussion

Father
argues that his family violence did not endanger Bethany, Brittany, and Brandon
but that it instead had “a salutary effect” on them.  He argues that there is
no evidence that the children suffered any injuries other than transitory ones
and that his discipline had no long-term, adverse effects on the children.  The
Department responds that there is ample evidence that Father endangered the
children, and it points to evidence of Father’s lengthy history of domestic
violence.  Specifically, the Department points to evidence that Father
assaulted Mother on an ongoing basis, that the children witnessed the abuse,
and that Father also assaulted the children, and it urges that Father’s
disciplinary techniques far exceeded the bounds of what society might describe
as those employed by a strict parent.

There
is also evidence that Father checked Bethany’s and Brittany’s genital areas for
evidence of sexual activity.  “It is beyond question that sexual abuse is
conduct that endangers a child’s physical or emotional well-being.”  In re
R.G., 61 S.W.3d 661, 667 (Tex. App.—Waco 2001, no pet.), disapproved of
on other grounds by J.F.C., 96 S.W.3d 256 (Tex. 2002); see also R.W.,
129 S.W.3d at 742.  Evidence of sexual abuse of one child is sufficient to
support a finding of endangerment with respect to other children.  See In re
K.M.M., 993 S.W.2d 225, 227 (Tex. App.—Eastland 1999, no pet.).  Father
argues that his actions did not cause his daughters physical harm, but he ignores
the emotional or psychological impact of his conduct.

Overall,
Father’s arguments are little more than efforts to minimize the considerable evidence
supporting the jury’s endangerment findings.  While the evidence is in many
respects conflicting given his and Mother’s denials at trial, the jury is the
sole judge of the credibility of the witnesses and the weight to be given to
their testimony.  See J.P.B., 180 S.W.3d at 573; see also In re T.N.,
180 S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.) (“[T]he fact finder,
as opposed to the reviewing body, enjoys the right to resolve credibility
issues and conflicts within the evidence.  It may freely choose to believe all,
part, or none of the testimony espoused by any particular witness.”).  Contrary
to Father’s contentions, the jury could have determined that Father endangered
Bethany, Brittany, and Brandon.

Applying
the appropriate standards of review, we hold that the evidence is factually
sufficient to support the jury’s findings that Father engaged in conduct or
knowingly placed Bethany, Brittany, and Brandon with persons who had engaged in
conduct that endangered their physical or emotional well-being and that he
knowingly placed or knowingly allowed Bethany, Brittany, and Brandon to remain
in conditions or surroundings that endangered their physical or emotional
well-being.  See Tex. Fam. Code Ann. § 161.001(1)(D), (E); see also
H.R.M., 209 S.W.3d at 108.  We thus overrule Father’s first and second
issues.[25]

V.  Best
Interest

Father
argues in his third issue that the evidence is factually insufficient to
support the jury’s finding that termination of his parental rights is in the
children’s best interest.  Mother argues in her sole issue that the evidence is
legally and factually insufficient to support the jury’s finding that
termination of her parental rights is in the children’s best interest.  See Tex.
Fam. Code Ann. § 161.001(2) (requiring clear and convincing evidence “that termination
is in the best interest of the child”).

A.  Applicable
Law

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  Nonexclusive factors that the trier of fact in a termination case may
use in determining the best interest of the child include:

(A)     the desires of the child;

 

(B)     the emotional and physical needs of the child now and in
the future;

 

(C)     the emotional and physical danger to the child now and in
the future;

 

(D)     the parental abilities of the individuals seeking custody; 

 

(E)     the programs available to assist these individuals to
promote the best interest of the child;

 

(F)     the plans for the child by these individuals or by the
agency seeking custody;

 

(G)     the stability of the home or proposed placement;

 

(H)     the acts or omissions of the parent which may indicate that
the existing parent-child relationship is not a proper one; and

 

(I)          
any excuse for the acts or omissions of the
parent.

 

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations
omitted).  These factors are not exhaustive; some listed factors may be
inapplicable to some cases; other factors not on the list may also be
considered when appropriate.  C.H., 89 S.W.3d at 27.  Furthermore,
undisputed evidence of just one factor may be sufficient in a particular case
to support a finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each factor will
not support such a finding.  Id.

B.  Discussion

Father
contends that his “hands-on approach to family discipline” has not caused his
children any substantial injuries.  Father also contends that Bethany and
Brittany have not suffered physically or mentally from the sexual inspections. 
Mother points to the strong presumption that keeping children with their parent
is in the children’s best interest, and she argues that she has always provided
her children with a safe environment.  Mother contends that her children have
not suffered any physical harm, that there is no domestic violence in her home,
and that Bethany lies and manipulates others.  Mother further contends that
while she does have a criminal history, she used the stolen money to provide
for her family.

Exposure
to domestic violence is relevant when considering a child’s best interest.  See
In re R.R., Jr., 294 S.W.3d 213, 235 (Tex. App.—Fort Worth 2009, no pet.); In
re M.R., 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.).  A
parent’s extensive criminal record also reflects on the best interest of the
children in maintaining a relationship with that parent.  See In re V.V.,
349 S.W.3d 548, 558 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en
banc); see also In re J.B.W., 99 S.W.3d 218, 229 (Tex. App.—Fort Worth
2003, pet. denied) (holding that incarceration is one factor courts can consider
when determining the best interest of the children in a termination case). 
Moreover, a parent’s noncompliance with a service plan may also affect a
factfinder’s consideration of the children’s best interest.  M.R., 243
S.W.3d at 821.

The
jury heard that Bethany, Brittany, and Brandon love Mother and Father.  But the
jury also heard Bethany testify that she wants Mother’s and Father’s parental
rights terminated, that she does not want to go home, and that she wants to be
adopted.  Brittany testified that she wants Mother’s and Father’s parental
rights terminated, and Brandon testified that he does not want to live with
Mother or Father.  The jury heard evidence that the children appear happy and
well-adjusted in their current placement, that their current foster parents
want to adopt them, and that the Department intends for the children’s current
foster parents to adopt them if their parents’ rights are terminated.

In
contrast, the jury heard evidence that Father has choked, punched, and slapped
the children and that he checked Bethany’s and Brittany’s genital areas for
evidence of sexual activity.  The children do not feel safe living with Father. 
Mother has a lengthy criminal history and was serving her second fourteen-month
sentence at the time of trial.  Also, Mother has not acknowledged Father’s
domestic violence or abuse of the children and seems intent upon living with
Father upon her release from jail.  Mother and Father denied all allegations against
them and argued that their children were lying.

The
record contains evidence of Father’s history of physical and sexual abuse and
his pattern of denial and refusal to adjust his conduct, even when faced with
the possibility of having his parental rights terminated.  The record also
reflects Mother’s history of domestic violence directed at Father, her
unwillingness to comply with her service plan, and her lengthy criminal
history.  Applying the appropriate standards of review, we hold that the
evidence is factually sufficient to support the jury’s finding that termination
of Father’s parental rights is in Bethany’s, Brittany’s, and Brandon’s best
interest.  See H.R.M., 209 S.W.3d at 108 (discussing factual sufficiency
standard of review).  We also hold that the evidence is legally and factually
sufficient to support the jury’s finding that termination of Mother’s parental
rights is in the children’s best interest.  See id.; see also J.P.B.,
180 S.W.3d at 573 (discussing legal sufficiency standard of review).  We
therefore overrule Father’s third issue and Mother’s sole issue.

VI.  Conclusion

Having
overruled Father’s and Mother’s respective dispositive issues, we affirm the
trial court’s judgment.

 

 

ANNE GARDNER
JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; GARDNER
and GABRIEL, JJ.

 

DELIVERED:  January 4, 2013









[1]See Tex. R. App. P. 47.4.





[2]We use aliases for all children named in our opinion to protect
their identities.  See Tex. R. App. P. 9.8(b)(2).





[3]Only Bethany, Brittany, and Brandon are involved in this appeal.





[4]Bethany and Brittany testified that when they used the term “fighting,” it included hitting.





[5]Father testified that he thought the police were there to arrest
Mother because she had been to jail twice before.





[6]When asked if he went to bed thinking that there was a police
officer hiding behind the bushes in his front yard, Father replied,
“Absolutely.”





[7]Mother testified that she agreed to allow Bradley to remain in the
permanent custody of the Department.





[8]Father testified that he did not work during that time and that
M.R. and Mother paid his bills.





[9]Mother testified that this was her second affair but her first
homosexual relationship.





[10]Mother testified that she supported herself with her paycheck.





[11]Bethany suggested that she was untruthful in her first deposition
because she did not remember or did not want to
remember.





[12]Bethany testified during the 2011 deposition that she remembered
smiling at a boy but did not remember that Father choked her.





[13]Brittany acknowledged that she testified in 2011 that she had not
seen Father hit Bethany.





[14]Brittany testified that Father checked her and Bethany separately
and that she did not remember if Bethany was in the room when she was checked. 
Bethany testified that she saw Father check Brittany twice a month.





[15]Bethany and Brittany each affirmatively answered questions that their
private area is the part on their body below their belly button and above their
knee.





[16]Father testified that he was an employee with the Electra Police
Department starting in the summer of 1995 after first serving as a volunteer
reserve employee.





[17]Forest Hill Police Department did not seek disciplinary action for
this incident because more than 180 days had elapsed since it occurred.  Mother
testified that the Arlington police lied about the incident.





[18]Father testified that he did not assault the Aaron’s Rental employee but had a disagreement with him.  He asked the employee to
leave, but when the employee refused, Father “exited [his] home and [the
employee] was just in the way of the door.”





[19]Thompson testified that he is a Licensed Professional Counselor and
a Licensed Professional of the Healing Arts.





[20]Mother’s initial charge was fraudulent use and possession of
identifying information.  Mother’s probation was revoked because she committed
a new theft by check offense while on probation.





[21]Mother did not go to jail until March 2011.





[22]Johnson testified that Father’s psychological evaluation from the
previous case carried over and counted for the current case.





[23]Father testified that he did sign the release.





[24]Johnson testified that Father saw A.J. Madden in the previous case
and that Father stated he did not like Madden.  Johnson arranged for Father to
see Dr. Vandehey, but when Father did not attend an appointment, Dr. Vandehey
refused to see Father.





[25]Along with a best interest finding, a finding of only one ground
alleged under section 161.001(1) is sufficient to support a judgment of
termination.  In re E.M.N., 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).  We thus need
not address the sufficiency of the evidence under section 161.001(1)(O).  See
id.; see also Tex. R. App. P. 47.1.